Filed 1/12/22  P. v. Burns CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058648 |
| v. | (Super. Ct. No. 14NF4955) |
| ALTON SEMAJ BURNS, | OPINION |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Cheri T. Pham and Maria D. Hernandez, Judges. Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

# INTRODUCTION

Defendant Alton Semaj Bums appeals from the judgment of conviction entered after he was found guilty in his first jury trial of domestic battery with injury and pimping, and then found guilty in his second jury trial of forcible rape, assault with force likely to produce great bodily injury, and kidnapping to commit a sex offense. We affirm.

We review and reject each of defendant's contentions of error as follows:

1.  As to defendant's challenges to his conviction for kidnapping to commit a sex offense, substantial evidence supports the asportation element of that offense. The evidence showed movement and increased danger to the victim that were not incidental to the commission of the rape offense. We reject defendant's argument that the asportation element of that offense is unconstitutionally vague on its face or as applied.

2.  The trial court did not err by instructing the jury with a modified instruction on unanimity at the second trial.

3.  The trial court did not abuse its discretion by admitting evidence of defendant's prior conviction for a sex offense under Evidence Code section 1108 at the second trial.

4.  The trial court did not err by admitting evidence of defendant's prior convictions for the purpose of impeaching defendant's testimony.

5.  The prosecutor did not commit misconduct at the second jury trial by introducing evidence to prove prior conviction sentencing enhancement allegations notwithstanding an agreement at the first trial to bifurcate a court trial on those allegations.

6.  The trial court did not err by instructing the jury with CALCRIM No. 1190: That instruction did not "[e]xcessively bolster[]" the victim's testimony and did not otherwise violate defendant's constitutional rights to due process and a fair trial. (Capitalization and boldface omitted.)

2

7.  Defendant requests that we independently review the documents reviewed in camera by the trial court, which were produced in response to defendant's subpoena seeking the victim's medical records. Our independent review reveals no error in the trial court's determinations of which documents were relevant and therefore released to defendant. In any event, any error in the trial court's determination of relevance would have been harmless.

## FACTS[1]

### I.

#### THE PROSECUTION'S CASE

On November 22, 2014, Amber B. lived with her six-month-old son in an apartment in Anaheim. That evening, Jesse Steve Mejia was with Amber at the apartment. After engaging in sexual intercourse, Amber and Mejia fell asleep in the bedroom of the apartment; Amber's son slept in a crib in the same room.

At about 1:00 a.m. on November 23, 2014, Amber woke up to find a man covering her mouth and saying to her, "[y]ou messed up, bitch." As the lights were off and it was dark, she could not then see that the male silhouette in front of her was defendant and assumed her ex-husband Willie J. had broken into her apartment. She felt the person "get off [her] face"; she heard a lot of scuffling and the man telling Mejia to leave the house and that he "need[ed] to handle something with Amber."

Amber had had problems with her ex-husband and had told Mejia about those problems.  Mejia had placed a chain latch lock on the front door of the apartment to help keep Amber safe from her ex-husband.  Amber had told Mejia to be prepared to "just leave the house and call the cops" if her ex-husband showed up at the apartment.

---

[1]  Similar evidence was presented at defendant's first and second trials.  The facts in this opinion are based on evidence presented in defendant's second trial as that evidence is relevant to the resolution of the issues on appeal.

3

Amber had locked the front door with the chain that night. She had felt secure and did not expect anyone to come over to her apartment.

Mejia fled the apartment wearing only boxer shorts. After Mejia had left and the lights were turned on in the apartment, Amber saw defendant and asked him what he was doing there. Defendant and Amber had been "just ... friends" who "sometimes" had a sexual relationship. Amber had given defendant a key to her apartment because she sometimes had seizures and might need someone to check on her.[2] She said that she had told him to call or text to let her know if he was going to come over to the apartment and she had not received any calls or texts from defendant. Defendant said he had been calling her on the phone. Amber saw the chain to the lock was broken.

Defendant grabbed Mejia's clothes that were beside Amber's bed and told her to show him where Mejia's car was parked. Mejia's car was parked about a half a block away. Amber was barefoot, wearing shorts and at-shirt, as she walked toward Mejia's car and pointed it out to defendant. As defendant walked toward Mejia's car, Amber used the opportunity to try to run back to the apartment and call the police. Defendant, however, told Amber to stop and wait for him. She froze in fear.

Defendant put Mejia's clothes on top of Mejia's car, came back to Amber, grabbed her arm, and pushed her back into the apartment. Defendant pushed her from behind through the front door of the apartment and into the living room. He told her to go into the bedroom; she replied, "No, I'm not going to the bedroom" and told him he needed to get out of her apartment. Defendant pushed her into the bedroom and pushed her onto the futon. Defendant kept saying, "you fucked up, bitch."

---

[2] Defense expert neuropsychologist Dr. Ann Gattuso testified that, based on her review of Amber's medical records and other evidence, Amber had several medical and psychiatric conditions that make her "dysfunctioning" and her memory process vulnerable. Specifically, Amber had a history of seizures, including psychogenic seizures, which could affect her memory functions.

4

Defendant went to the bathroom and grabbed hair conditioner. Defendant returned, tried to take off Amber's clothes, twice slapped Amber on the left side of her face, and kept telling her to stop fighting him. Defendant choked her with one hand. Amber tried to get him to stop because she could not breathe and began to see black. Defendant forced her onto her knees and was at that point able to take off her clothes. Amber was screaming for defendant to stop.

Defendant put conditioner on his penis and tried to penetrate her anus. Amber was able to fight him off by pushing her body down. He flipped her on to her back and penetrated her vagina "very violently," causing her significant pain. Defendant and Amber had had consensual sexual intercourse before, but defendant never used conditioner as a lubricant, tried penetrating her anus, or used the kind of force he used that night.

Defendant stopped the assault when he and Amber heard police officers banging on the front window of the apartment and saw flashlights. Amber thought neighbors might have called the police.[3] Amber went to the bathroom and put on a robe. Defendant told her to "play it cool" and "I'm here to see you." He told her that if the cops asked her questions, she should tell them he knew her. Defendant rushed to put his pants on. Amber was crying and was unable to sit down because of the pain she was experiencing.

[3] A detective of the Anaheim Police Department vice unit testified that at around 1:10 a.m. on November 23, 2014, he was dispatched to a street in Anaheim and, while en route, was flagged down by Mejia who was wearing only boxers and standing in a 7-Eleven parking lot. Mejia talked fast and was out of breath and directed them to Amber's apartment where he said help was needed. Several officers responded to Amber's apartment; defendant answered the door wearing pants, underwear, and shoes.
  Mejia had called the dispatch communication center and told the dispatcher that Amber's ex-husband had appeared that night and threatened to kill Amber. Mejia said his "stuff is in her room" and her ex-husband had shown up and said to Mejia, "[w]ho the fuck are you? Get the fuck out or I'll kill you." Mejia told police he thereafter ran out of the apartment wearing only his boxers.

5

After defendant opened the front door of the apartment, police officers asked Amber whether everything was okay. Amber replied, "No, he was raping me." She described what had happened and the police officers asked her to go take a forensic examination for sexual assault. Amber complained of pain in her throat and pain in her vagina. A forensic specialist with the Anaheim Police Department who responded to the apartment that night observed redness to Amber's throat. Officers observed the chain of the front door chain lock was broken and lying on the floor.

Amber was transported to Anaheim Regional Medical Center where forensic nurse specialist Jennifer Rivera conducted a forensic sexual assault examination of Amber at 3:30 a.m. November 23, 2014. Rivera found a bruise on the inside of the inner cheek on the left side of Amber's mouth, two linear bruises on Amber's neck, a large tear at the base of the opening of the vagina, and abrasions in the area between the vagina and the anus. The injuries Amber sustained to her genital area were consistent with forced sexual contact.

Amber's complaints of having a raspy throat and throat pain and the evidence of physical injury to her neck were consistent with having been strangled.

II.

**DEFENDANT'S TESTIMONY**

Defendant testified in his defense. He said he went to Amber's apartment because she had had a seizure the prior Friday and he was concerned and decided to check on her. He called out to Amber and when nobody answered he used the key he had and pressed the apartment's front door open, breaking the metal chain latch. He found Amber in bed with Mejia.

Amber told defendant that Mejia was a friend from college and that she had messed up. After Mejia left the apartment, defendant became worried that Mejia was outside the apartment wearing only boxers, which might attract police attention.

6

Defendant had recently been released from prison after serving over 11 years and he was worried about his parole status.

Defendant testified that when he was 16 years old, in April 1999, he pleaded no contest to committing forcible sexual penetration with a foreign object in violation of Penal Code section 289, subdivision (at while he was in the custody of the Youth Authority. In September 2001, he had been convicted of robbery in violation of section 211 for which he served over 11 years before he was released on February 3, 2012; he was placed on parole and given a GPS ankle monitor which he was wearing on the night Amber was assaulted.

Defendant was worried he might be in violation of his parole if he had Mejia's property; he was also worried Mejia might accuse him of taking his property or hitting him. Defendant walked outside to look for Mejia to give him his clothes so he could leave. After defendant walked around and did not see Mejia, he came back to the apartment and saw Amber holding Mejia's clothes. Defendant asked her to show him which vehicle belonged to Mejia; she walked with him halfway down the block and gave him Mejia's clothes and the keys to Mejia's car. Defendant put the clothes in Mejia's car and he and Amber walked back to the apartment. They discussed how Amber had "fucked up."

Defendant and Amber went back into the apartment and talked about a text message defendant had received from a woman who claimed she was pregnant with his child. Amber asked him if he was leaving her, and he responded he was not even though in his mind he "was gone."

Defendant and Amber started kissing and began engaging in sexual intercourse when they heard the police bang on the door. Defendant testified there had

---

[4] All further statutory references are to the Penal Code unless otherwise specified.

7

been "no breakup period" between Amber and him and that they had been in communication the week leading up to that night.

## PROCEDURAL HISTORY

### I.

### THE FIRST JURY TRIAL

Defendant was charged in a second amended information with (1) forcible rape in violation of section 261, subdivision (a)(2) (count l); (2) attempted forcible sodomy in violation of sections 664, subdivision (a) and 286, subdivision (c)(2)(A) (count 2); (3) first degree residential burglary in violation of sections 459 and 460, subdivision (a) (count 3); (4) assault with force likely to produce great bodily injury in violation of section 245, subdivision (a)(4) (count 4); (5) domestic battery with corporal injury in violation of section 273.5, subdivision (a) (count 5); (6) assault with intent to commit a sexual offense in violation of section 220, subdivision (a)(1) (count 6); (7) assault with intent to commit a sexual offense during first degree burglary in violation of section 220, subdivision (b) (count 7); (8) kidnapping in violation of section 207, subdivision (a) (count 8); (9) kidnapping to commit a sex offense in violation of section 209, subdivision (b)(l) (count 9); (10) false imprisonment by menace, violence, fraud, or deceit in violation of sections 236 and 237, subdivision (a) (count 10); (11) human trafficking in violation of section 236.1, subdivision (b) (count 11); (12) pimping in violation of section 266h, subdivision (a) (count 12); and (13) pandering in violation of section 266i, subdivision (a) (count 13).

The second amended information alleged, as pertinent to this appeal, the following prior conviction sentencing enhancement allegations: (1) pursuant to section 667.61, subdivisions (a) and (d)(l), defendant had been previously convicted of violating section 289, subdivision (a); (2) defendant had previously suffered two or more serious and violent felony convictions pursuant to sections 667, subdivisions (d) and (e)(2)(A)

8

and 1170.12, subdivisions (b) and (c)(2)(A); (3) he had served a prior prison term within the meaning of section 667.5, subdivision (b); and (4) pursuant to section 667, subdivision (a)(1), he had been previously convicted of two serious felonies listed in section 1192.7.

During the first jury trial, the court granted the prosecution's motion to have counts 2, 6, 8, and 10 dismissed. Defendant waived a jury trial on the prior conviction sentencing enhancement allegations and elected to have those allegations tried by the court in the event the jury found him guilty of the charged offenses.

The jury found defendant guilty on count 5 (domestic battery with corporal injury) and count 12 (pimping). The jury found defendant not guilty on count 13 (pandering) and not guilty of its lesser included offense.

The jury was unable to reach a verdict as to counts 1, 3, 4, 7, 9, and 11. The trial court's minutes state, "Counsel stipulated the court trial on the priors will be addressed once all counts have been adjudicated accordingly."

## II.

### THE SECOND JURY TRIAL

Before the retrial of the counts on which the jury was unable to return a verdict, defendant asked to represent himself. His motion for in propria persona status was granted by the trial court.

The prosecution filed a third amended information which renumbered the remaining charges to be tried as follows: (1) forcible rape in violation of section 261, subdivision (a)(2) (count l); (2) assault with force likely to produce great bodily injury in violation of section 245, subdivision (a)(4) (count 2); and (3) kidnapping to commit a sex offense in violation of section 209, subdivision (b)(l) (count 3). The third amended information also included the counts for domestic battery with corporal injury (as count 4), and pimping (as count 5) of which defendant had already been found guilty during the first jury trial. The trial court confirmed counts 4 and 5 of the third amended information

9

would not be read to the jury. The third amended information also contained the same prior conviction sentencing enhancement allegations as those contained in the second amended information.

The jury found defendant guilty of counts 1, 2, and 3 of the third amended information and found all prior conviction sentencing enhancement allegations, identified *ante,* to be true.

The trial court sentenced defendant to a determinate prison term of 10 years plus an indeterminate prison term of 35 years to life. Defendant appealed.

## DISCUSSION

### I.

#### KIDNAPPING TO COMMIT A SEX OFFENSE-SECOND TRIAL

Defendant challenges his conviction for kidnapping to commit a sex offense on two grounds. First, he argues his conviction is not supported by substantial evidence because there is insufficient evidence of movement and increased danger to Amber other than that incidental to the commission of the underlying sex offense. Second, he argues that the asportation element of the offense is unconstitutionally vague on its face and as applied to him. For the reasons we shall explain, defendant's arguments are without merit.

#### A.

#### *Governing Legal Principles*

"[S]imple kidnapping" in violation of section 207, subdivision (a) requires proof of "'three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.'" *(People v. Bell* (2009) 179 Cal.App.4th 428, 435.) "This last element, i.e., that the victim be moved a substantial distance, is called the 'asportation' element." *(Ibid)*

"Aggravated kidnapping," in violation of section 209, subdivision (b)(1), involves a kidnapping "for the purpose of robbery or certain sex offenses." *(People v. Martinez* (1999) 20 Cal.4th 225, 232, overruled on a different ground in *People v. Fontenot* (2019) 8 Cal.5th 57, 70.) The asportation element of aggravated kidnapping has two prongs: "[A]ggravated kidnapping requires movement of the victim that is not merely incidental to the commission of the underlying crime and that increases the risk of harm to the victim over and above that necessarily present in the underlying crime itself." *(People v. Martinez, supra,* at p. 232.) "The two prongs of aggravated kidnapping are not distinct, but interrelated, because a trier of fact cannot consider the significance of the victim's changed environment without also considering whether that change resulted in an increase in the risk of harm to the victim." *(Id* at p. 236.)

In *People v. Martinez, supra,* 20 Cal.4th at page 233, the Supreme Court explained: "In determining 'whether the movement is merely incidental to the [underlying] crime ... the jury considers the "scope and nature" of the movement. [Citation.] This includes the actual distance a victim is moved. However, we have observed that there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong."' The court further explained that analysis of the second prong of the asportation element of aggravated kidnapping involves "' consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased."' *(Ibid)*

In *People v. Dominguez* (2006) 39 Cal.4th 1141, 1149 *(Dominguez),* the California Supreme Court "once again address[ed] the question of when evidence of forced movement of a victim is sufficient to satisfy the statutory requirement of asportation, a critical element of the crime of aggravated kidnapping." In that case, substantial evidence showed that the defendant forced the victim against her will to move

11

from the shoulder of a road, down an embankment, and partially into a walnut orchard that was approximately 25 feet away from the road, for the purpose of committing a rape. *(Id* at p. 1151.) The defendant argued the forced movement was for a distance no greater than that which was merely incidental to the commission of the rape and did not substantially increase the risk of harm to his victim. *(Ibid.)*

The Supreme Court explained: "Whether a forced movement of a rape victim (or intended rape victim) was merely incidental to the rape, and whether the movement substantially increased the risk of harm to the victim, is difficult to capture in a simple verbal formulation that would apply to all cases. We discussed the standard in *[People* v.] *Rayford* [(1994) 9 Cal.4th 1] and explained that the jury must 'consider[] the "scope and nature" of the movement,' as well as 'the context of the environment in which the movement occurred.' [Citations.] This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment. Moreover, whether the victim's forced movement was merely incidental to the rape is necessarily connected to whether it substantially increased the risk to the victim. 'These two aspects are not mutually exclusive, but interrelated.'" *(Dominguez, supra,* 39 Cal.4th at pp. 1151-1152, italics omitted.) The Supreme Court further explained: "The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement. [Citation.] We have articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes." *(Id* at p. 1152.)

The Supreme Court concluded that the appellate court, in finding insufficient evidence of asportation in that case, "focused too narrowly on a subsidiary aspect of the analysis, measured distance, rather than considering how all the attendant circumstances related to the ultimate question of increased risk of harm." *(Dominguez, supra,* 39 Cal.4th at p. 1152.) The court explained that, although it is necessary to

12

consider the actual distance the victim was forced to move, "we have repeatedly stated no minimum distance is required to satisfy the asportation requirement [citation], so long as the movement is substantial [citation]. [if] Measured distance ... is a relevant factor, but one that must be considered in context, including the nature of the crime and its environment. In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient." *(Ibid)*

The Supreme Court cited several examples: "For example, moving robbery victims between six and 30 feet within their home or apartment [citation] or 15 feet from the teller area of a bank to its vault [citation] may be viewed as merely incidental to the commission of the robbery and thus insufficient to satisfy the asportation requirement of aggravated kidnapping. Yet, dragging a store clerk nine feet from the front counter of a store to a small back room for the purpose of raping her [citation] or forcibly moving a robbery victim 40 feet within a parking lot into a car [citation] might, under the circumstances, substantially increase the risk of harm to the victim and thus satisfy the asportation requirement." *(Dominguez, supra,* 39 Cal.4th at p. 1152; see *People v. Rayford, supra,* 9 Cal.4th at p. 23 [substantial evidence supported asportation element in aggravated kidnapping case in which the victim was forcibly moved 105 feet at night from the parking lot of a closed store to the other side of a wall, "limit[ing] detection" of the victim from the street]; *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1046 [as the defendant forcibly moved his victim 133 feet at night into an unlit area where he "was less likely to be detected," such movement was not merely incidental to the crime of kidnapping to commit rape but also increased the risk of harm to the victim].)

The Supreme Court stated that "a forced movement need not be into an 'enclosure' to effect a substantial increase in the risk of harm. Moreover, a reasonable jury could have concluded that the place to which the victim was moved was in fact one obscured from public view." *(Dominguez, supra,* 39 Cal.4th at p. 1154; see *People v.*

13

*Aguilar, supra,* 120 Cal.App.4th at p. 1049 ["Courts have held that moving a victim to a more isolated open area which is less visible to public view is sufficient" to prove asportation].)

Applying those governing legal principles, the California Supreme Court held substantial evidence supported the defendant's conviction for aggravated kidnapping in light of the evidence the victim was moved to a "more secluded" location "where it was unlikely any passing driver would see her," which "substantially decreas[ed] the possibility of detection, escape or rescue." *(Dominguez, supra,* 39 Cal.4th at p. 1153.)

In 1997, after the crimes at issue in *Dominguez* had been committed, the Legislature revised section 209, subdivision (b) to "eliminat[e] the requirement that the movement of the victim 'substantially' increase the risk of harm to the victim." *(People v. Vines* (2011) 51 Cal.4th 830, 869, fn. 20, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

**B.**

***Substantial Evidence Supported the Asportation Element of the Aggravated Kidnapping Count.***

Here, Amber testified that, after she complied with defendant's request to walk outside the apartment and show him the car that belonged to Mejia about a half a block away, she tried to run away from defendant and back to the apartment to call the police. Defendant ordered her to stop and to wait for him. She complied, explaining she "just froze. Like, I got scared." Defendant put Mejia's clothes on top of Mejia's car, approached Amber, grabbed her by the arm, and physically made her go back into the apartment. He pushed her from behind through the front door of the apartment. Once inside, defendant ordered her to go into the bedroom and, when she refused, pushed her into the bedroom and onto a futon. Defendant grabbed conditioner to use a lubricant and thereafter commenced his sexual assault of Amber.

14

A reasonable trier of fact could have inferred defendant's movement of Amber from the street outside her apartment to the inside of the apartment, and then from the living room of the apartment to the bedroom, "served several purposes" *(People v. Robertson* (2012) 208 Cal.App.4th 965, 985), and was not merely incidental to the commission of the rape. Substantial evidence supported the inference defendant's forced movement of Amber was done to decrease the likelihood of detection as he limited the visibility of his sexual offense by moving her from the street to inside the apartment. Also, were Amber to scream for help, as she testified she had done during defendant's sexual assault, it would have been more difficult for someone outside the apartment to hear her, and still more difficult to hear her from the bedroom of her apartment. Substantial evidence supported the inference that by so secluding Amber, defendant enhanced his opportunity to commit additional crimes against her.

Substantial evidence showed Amber was more easily restrained and less likely to escape after she was forced to go into the apartment and then into the bedroom of the apartment than when she was standing on the street. While outside on the street showing defendant which car was Mejia's, Amber was able to start to run away from defendant. Defendant was initially able to stop Amber by ordering her to stop and he was ultimately able to prevent her from escaping by securing her inside an interior room of her apartment. By moving Amber into the apartment, and then into the bedroom, defendant undoubtedly increased the risk of harm to Amber over and above that necessarily present in committing the offense of rape against her.

## C.

### *The Asportation Element of Aggravated Kidnapping Is Not Unconstitutionally Vague on Its Face or as Applied to Defendant.*

Defendant argues the asportation element of aggravated kidnapping in violation of section 209, subdivision (b) is unconstitutionally vague both on its face and as applied to him. He argues there is not a meaningful distinction between the movement

15

required for simple kidnapping and that for aggravated kidnapping. He argues that the statute "leaves the asportation element for any kidnapping, as well as the distinction between simple and aggravated asportation, unduly vague and susceptible of arbitrary enforcement for California defendants charged with kidnapping." In support of his argument that the asportation element is facially vague, defendant points to the lack of a "fixed minimum sufficient distance for purposes of the substantial movement element of both simple and aggravated kidnapping" and that, in cases like this one involving associated crimes, both simple and aggravated kidnapping involve consideration of the same elements to assess asportation. Defendant does not provide any further analysis of how the offense is unconstitutionally vague as applied to him.

"'The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of "life, liberty, or property without due process of law," as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7). Under both Constitutions, due process of law in this context requires two elements: a criminal statute must "'be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt."'" *(People v. Mclnnis* (2021) 63 Cal.App.5th 853, 858 *(Mclnnis).)*

In *People v. Ledesma* (2017) 14 Cal.App.5th 830, 839-840 *(Ledesma),* a panel of this court rejected a similar constitutional vagueness challenge to a conviction for aggravated kidnapping in violation of section 209, subdivision (b). The court explained: "California's aggravated kidnapping statute, section 209, requires proof of certain elements not required for prosecution under the simple kidnapping statute, section 207. For instance, as in this case, the statute applies if the kidnapping is done for the purpose of committing rape. (§ 209, subd. (b)(1).) Section 209, modified by the Legislature in 1997 to conform to existing case law, requires that the movement of the victim be 'beyond that merely incidental to the commission of, and increases the risk of

16

harm to the victim over and above that necessarily present in, the intended underlying offense.' (§ 209, subd. (b)(2); see *People v. Martinez* (1999) 20 Cal.4th 225, 232, fn. 4 ... [noting 1997 modification to codify asportation standard set forth in *People v. Daniels* (1969) 71 Cal.2d 1119 ...   ; Stats. 1997, ch. 817, § 17, p. 5589; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 59 (1997-1998 Reg. Sess.) as amended Sept. 4, 1997, p. 3.)

"These two aspects of the asportation requirement, movement beyond that which is incidental to the underlying crime and movement that increases the risk of harm to the victim, "'are not mutually exclusive, but interrelated." [Citation.] [if] In determining "whether the movement is merely incidental to the [underlying] crime ... the jury considers the 'scope and nature' of the movement. [Citation.] This includes the actual distance a victim is moved. However, ... there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong." [Citations.] [if] "The second  prong  ...  refers to whether  the movement  subjects  the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime]. [Citations.] This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased."'" *(Ledesma,  supra,* 14 Cal.App.5th at p. 836.)

The *Ledesma* court further stated: "Since the 1997 modification of the statute, appellate courts have routinely assessed the validity of aggravated kidnapping convictions in published decisions without suggestion that the section 209, subdivision (b)(2) asportation requirement is unworkable or too vague to be constitutional.  (See, e.g., *People v. Williams* (2017) 7 Cal.App.5th 644, 667-668 ... [incidental movement of the victims insufficient to support convictions under§ 209]; *People v. Simmons* (2015)

17

233 Cal.App.4th 1458, 1471-1474 ... [ample evidence of asportation to support § 209 convictions]; *People v. Robertson* (2012) 208 Cal.App.4th 965, 983-987 ... ; see also *People v. Vines* (2011) 51 Cal.4th 830, 869-871 ... [affirming aggravated kidnapping conviction under pre-1997 version of § 209, subd. (b)].)"

After addressing and rejecting other arguments raised by the defendant in support of his vagueness challenge that are not raised by defendant here, the *Ledesma* court concluded: ""'"The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as 'reasonable,' 'prudent,' 'necessary and proper,' 'substantial,' and the like. Indeed, a wide spectrum of human activities is regulated by such terms: thus one man may be given a speeding ticket if he overestimates the 'reasonable or prudent' speed to drive his car in the circumstances (Veh. Code, § 22350), while another may be incarcerated in state prison on a conviction of willful homicide if he misjudges the 'reasonable' amount of force he may use in repelling an assault [citation].... 'There is no formula for the determination of reasonableness.' Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind."'" *(Ledesma, supra,* 14 Cal.App.5th at pp. 839-840; see *McInnis, supra,* 63 Cal.App.5th at p. 864 [relying in part on *Ledesma,* "we reject his contention that the aggravated kidnapping statutes are void for vagueness"].)

Here, although the Attorney General cited *Ledesma* in the respondent's brief, defendant does not acknowledge much less distinguish *Ledesma* in his appellate briefs. We agree with *Ledesma* and reject defendant's argument the asportation requirement of kidnapping to commit a sex offense in violation of section 209, subdivision (b) is unconstitutionally vague on its face or as applied to him.

**THE TRIAL COURT DID NOT ERR IN INSTRUCTING THE JURY ON UNANIMITY AT THE SECOND TRIAL.**

During the second trial, the trial court instructed the jury with CALCRIM No. 3500, modified to state as follows: "The defendant is charged with Forcible Rape in Count One, Assault with Force Likely to Produce Great Bodily Injury in count Two and Kidnapping to Commit a Sex Offense in Count Three. The People have presented evidence of more than one act to prove the defendant committed these offenses. You must not find the defendant guilty unless you all agree the People have proved that the defendant committed at least one of these acts for these offenses and you all agree on which act he committed." Defendant contends this instruction was flawed and violated his constitutional rights because it "failed to inform the jury that a unanimous jury finding as to the act constituting each count was required." (Bold and some capitalization omitted.)

Defendant has forfeited his claim of instructional error. He did not object to the trial court instructing the jury with CALCRIM No. 3500, or any other instruction, and does not contend the trial court erred by failing to give any additional instruction. "'"A party may not complain on appeal that an instruction *correct in law and responsive to the evidence* was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."'" *(People v. Hill* (1992) 3 Cal.4th 959, 997, italics added, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Even if defendant's argument is not forfeited, it is without merit. "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." *(People v. Houston* (2012) 54 Cal.4th 1186, 1229.) "'[A]ny theoretical possibility of

19

confusion [may be] diminished by the parties' closing arguments."' *(People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, overruled on a different ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Here, the jury was also instructed with CALCRIM No. 3515 which stated: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." The jury was also instructed with CALCRIM No. 3550 which stated, in part: "Your verdict *on each count* and any special findings *must be unanimous.* This means that, to return a verdict, all of you must agree to it." (Italics added.)

Furthermore, any theoretical possibility of confusion was resolved by the prosecutor's closing argument: "You heard this instruction about unanimity. This is just, there were multiple acts that happened from the testimony. You all have to agree on *what act* happened to constitute *each crime,* okay." (Italics added.) The prosecutor thereafter explained the act underlying each count. He explained the rape charge was based on defendant penetrating Amber's vagina with his penis by use of force, violence, duress, menace, or fear. As to count 2 for assault with force likely to commit great bodily injury, the prosecutor stated: "When he is strangling her and she's fighting for her life trying to breathe, she can't talk, she has a raspy voice afterward, she has difficulty swallowing, she feels like she has strep throat for like hours to a week. She still has bruising when the nurse sees her at 3:30 in the morning. All of that is evidence for the amount of force he used when he strangled her in order to accomplish the rape. Members of the jury, I submit to you he's guilty of count 2 as well."

As to count 3, kidnapping with the intent to commit a sex offense, the prosecutor explained: "Here is what is required: He intended to commit rape or sodomy; acting with that intent he took her, held her or detained her using force or instilling fear; he moved her a substantial distance; the movement was more than that just incidental to committing a rape or a sodomy; that when he did move her, *basically when he told her*

20

*stop, go back into the apartment and he pushes her into the apartment and he pushes her back into the bedroom, when he was doing that movement,* he already had the intent of what he was going to do when he got her into that room, which is to rape or sodomize her." (Italics added.)

In light of the instructions given to the jury as a whole and the prosecutor's statements during closing argument regarding unanimity, given the facts of this case, there is no reasonable likelihood the jury applied CALCRIM No. 3500 in an impermissible manner.

III.

**THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING EVIDENCE OF DEFENDANT'S PRIOR SEX OFFENSE UNDER EVIDENCE CODE SECTION 1108.**

Defendant argues the trial court erred at the second jury trial by admitting evidence of his 1999 conviction for committing the offense of forcible sexual penetration with a foreign object in violation of section 289, subdivision (a). He argues the evidence did not meet the standards of Evidence Code sections 1108 and 1101 and was otherwise inadmissible because its probative value was substantially outweighed by its prejudicial impact within the meaning of Evidence Code section 352. He argues the trial court's evidentiary error violated his rights to due process and a fair trial and thus cannot be harmless.

In *People v. Erskine* (2019) 7 Cal.5th 279, 295 *(Erskine),* the California Supreme Court restated the general principles governing the interplay of Evidence Code sections 1101, 1108, and 352 in determining the admissibility of evidence of prior sex offenses as follows: "'Evidence Code section 1101, subdivision (a) sets forth the "'strongly entrenched'" rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion.' [Citation.] 'At the same time, "other crimes" evidence is admissible under Evidence Code section 1101, subdivision (b) "when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent,

knowledge, identity, or absence of mistake or accident in the charged crimes."' [Citation.] 'In this inquiry, the degree of similarity of criminal acts is often a key factor, and "there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: 'The least degree of similarity ... is required in order to prove intent ....' ... By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity."'"

Evidence Code "[s]ection 1108 'carves out an exception to [Evidence Code] section 1101."' *(Erskine, supra,* 7 Cal.5th at p. 295.) Evidence Code section 1108, subdivision (a) "provides that '[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."' *(Erskine, supra,* at p. 295.)

Here, defendant was accused of forcible rape in count 1 of the third amended information. That offense and defendant's prior offense of committing forcible sexual penetration with a foreign object in violation of section 289, subdivision (a), are included in the definition of "sexual offense" set forth in Evidence Code section 1108, subdivision (d)(l)(A). We therefore next determine whether the trial court abused its discretion by finding evidence of the prior offense admissible under Evidence Code section 352.

Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." It therefore "follows that if evidence satisfies the requirements of section 1108, including that it is not inadmissible under [Evidence Code] section 352, then the admission of that

22

evidence does not violate [Evidence Code] section 1101." *(People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823.) We review the trial court's ruling admitting evidence under Evidence Code sections 352, 1101, and 1108 for an abuse of discretion. *(Id* at p. 824.)

In determining the admissibility under Evidence Code section 352 of evidence of past sexual offenses offered under Evidence Code section 1108, the court must "undertake[] a careful and specialized inquiry to determine whether the danger of undue prejudice from the propensity evidence substantially outweighs its probative value." *(People v. Merriman* (2014) 60 Cal.4th 1, 41.) Factors to be considered by the court include the "'nature, relevance, and possible remoteness [of the evidence], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses."' *(Ibid).*

At the hearing on the admissibility of the evidence of the prior sex offense under Evidence Code section 1108, the trial court found the evidence admissible: "When I look at a[n Evidence Code section] 352 analysis, it is absolutely probative. I would agree with you any time we hear [Evidence Code section] 1101 or 1108 evidence, it is prejudicial but it is surely not outweighed by the probative value and the purpose behind [Evidence Code section] 1108 evidence when we hear it. I will note it is not too remote in time especially in light of the period of incarceration that you were detained in between the alleged offense before this court and the actual prior allegation pursuant to [Evidence Code section] 1108."

In his opening brief, defendant argues: "Here, due to the remoteness in time, coupled with the lack of similarity to the charged offense, evidence of the prior

23

section 289 offense should have been excluded as propensity evidence. [Defendant] was 16 years old when he pled no contest to the charge under section 289 involving his cell mate at a youth facility, which reportedly occurred in April of 1998, 21 years before trial and nearly 16 years prior to the alleged offenses involving Amber."

Defendant's prior sex offense and the current sex offense are not so dissimilar to render evidence of the prior sexual offense irrelevant. Both crimes constituted sexual assaults involving anal penetration. The prior sex offense was not too remote in time to be sufficiently probative. The record shows defendant pleaded guilty to that offense in 1999, and then was convicted of robbery in 2001 for which he served a prison term of over 11 years before being released on parole. He was out of custody and on parole for less than three years before committing the instant rape offense. (See *People v. Walker* (2006) 139 Cal.App.4th 782, 807 ["Although the time between the two offenses is significant, more than 20 years, [the defendant] was incarcerated for approximately 11 of those years, thus minimizing the remoteness"].)

Defendant argues his imprisonment is not relevant here in weighing the remoteness of his prior sexual offense because the prior offense occurred during incarceration and "there were no instances or allegations of any kind of sexual or other offenses by [defendant] during his imprisonment. ....... [B]ecause [defendant]'sjuvenile prior was committed in custody, the fact that he spent eleven of the intervening years in prison on another charge without committing any sexual offenses, supports the conclusion that the trial court abused its discretion in admitting the offense under section 1108." Defendant's argument assumes too much. At a minimum, the fact of defendant's incarceration limited his opportunity and ability to commit further sex offenses than if he were not incarcerated.

Because defendant had pleaded guilty to committing forcible sexual penetration with a foreign object in 1999, the degree of certainty that he committed the prior sex offense was not in question.

24

Informing the jurors that defendant had been convicted of the prior sexual offense lessened the risk the jurors would be tempted to punish him in the instant case for the prior sex offense. Furthermore, the prior sex offense evidence did not present the likelihood of confusing, misleading, or distracting the jurors from their main inquiry. Defendant does not contend the trial court abused its discretion by failing to limit or sanitize the evidence pertaining to his prior sex offense.

The trial court therefore did not abuse its discretion by concluding Evidence Code section 352 did not bar admission of evidence of the prior sex offense.

**IV.**

**ANY ERROR IN PERMITTING THE PROSECUTOR TO IMPEACH DEFENDANT'S TESTIMONY WITH HIS PRIOR CONVICTION FOR FORCIBLE SEXUAL PENETRATION WITH A FOREIGN OBJECT WAS HARMLESS.**

Defendant contends the trial court erred by permitting the prosecutor to impeach defendant's testimony at both jury trials with evidence of his prior conviction for forcible sexual penetration with a foreign object. Although in his opening brief, defendant sometimes generally refers to his prior *convictions,* he does not argue or analyze why his prior robbery conviction was ineligible for impeachment purposes. The Attorney General points this out in the respondent's brief, but defendant does not address any error regarding use of that prior conviction for impeachment purposes in his reply brief.

Defendant challenges the use of his prior conviction for forcible sexual penetration with a foreign object for impeachment purposes by suggesting that conviction was not one of moral turpitude and otherwise failed to meet other factors. ""'[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude."' [Citation.] Beyond this, the "'trial courts have broad discretion to admit or exclude prior convictions for impeachment purposes ...."' [Citation.] 'When determining whether to admit a prior conviction for

25

impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify.' [Citation.] The impeaching offense may postdate the charged offense." *(People v. Edwards* (2013) 57 Cal.4th 658, 722.)

The parties do not cite any legal authority, and we have found none, addressing whether the offense of forcible sexual penetration with a foreign object in violation of section 289, subdivision (a) qualifies as an offense involving moral turpitude. We do not need to address that issue because, even if the trial court erred by allowing the prosecutor to impeach defendant's testimony with that prior conviction, any such error would be harmless.

In the second jury trial, evidence of defendant's prior conviction for forcible sexual penetration with a foreign object was admitted under Evidence Code section 1108. For the reasons we explained *ante,* the trial court did not abuse its discretion by admitting that evidence. The jurors therefore already knew defendant had suffered that prior conviction and they could take that fact into account in evaluating his credibility as a witness at trial. The trial court instructed the jury with CALCRIM No. 226 on how to evaluate a witness's testimony and in so doing specifically instructed the jurors that they could consider whether the witness has been convicted of a felony in evaluating credibility. Any error in also admitting this evidence to impeach defendant's testimony was therefore harmless.

In the first jury trial, defendant's testimony was impeached with his prior convictions for robbery and forcible sexual penetration with a foreign object, although evidence of his prior conviction for the latter offense was not admitted under Evidence Code section 1108 at that trial. We conclude, however, that even if the trial court erred by permitting the prosecutor to impeach defendant with his prior sex offense conviction, any error was harmless.

26

The jury in the first trial was unable to reach a verdict on the forcible sex offense counts such as rape and attempted forcible sodomy. The jury in the first trial found defendant guilty only of domestic battery with corporal injury and of pimping. The jury was aware that defendant had committed a prior felony as he had been impeached with evidence of his prior conviction for robbery. As the jury was instructed with CALCRIM No. 226 at the first jury trial, it was instructed that it could consider that defendant had been convicted of a felony (the robbery) in evaluating his credibility. We cannot say it is more likely than not the result of the first trial would have been different had the trial court refused to permit the prosecution to impeach defendant's testimony with his prior conviction for forcible sexual penetration with a foreign object. (Cal. Const., art. VI,§ 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## V.

### THE PROSECUTOR DID NOT ENGAGE IN MISCONDUCT AT THE SECOND JURY TRIAL.

Defendant contends the prosecutor committed prosecutorial misconduct by violating the parties' agreement to bifurcate trial on the prior conviction sentencing enhancement allegations and introducing documentary evidence of defendant's prior convictions at the second jury trial. The record does not show the prosecutor engaged in misconduct but, even if it establishes prosecutorial misconduct, it was harmless.

### A.

### *Background*

Before the first trial, defendant moved to bifurcate trial on the charged offenses from the prior conviction sentencing enhancement allegations of the second amended information. Defendant also waived a jury trial on the prior conviction sentencing enhancement allegations. After the first jury trial concluded and the jury had been unable to reach a verdict on several counts, counsel stipulated that the court trial on the priors would be addressed once all counts had been adjudicated.

27

The trial court granted defendant's motion to represent himself at the second trial. In the prosecution's trial brief filed before the second trial, the prosecutor informed the court of defendant's earlier motion to bifurcate adjudication of the prior convictions and other allegations involving the prior convictions and stated: "Assuming the defense is making the same request the People join." The record does not show defendant responded to the prosecution's offer to join a request to bifurcate the prior conviction sentencing enhancement allegations in the second trial.

The following month, and also before the second trial, the prosecution filed a supplemental trial brief in which the prosecution moved for permission to introduce defendant's prior testimony regarding his conviction for robbery at "the bifurcated trial, or as impeachment for a felony conviction of moral turpitude should the defendant testify again in the current trial." The record does not show defendant objected or otherwise responded to the prosecutor's request.

At a pretrial hearing on motions in limine, in seeking to have evidence of the prior convictions admitted under Evidence Code section 1108 and/or for the purpose of impeaching defendant's testimony at the second trial, the prosecution stated: "Additionally, your honor, it is also part of the case of proving the priors against him. He's alleged to have committed a prior for [section] 667 and also under the Three Strikes Law, so they would also be offered for that purpose as well." After explaining its ruling on the admissibility of evidence under Evidence Code section 1108 and/or for the purpose of impeachment, the court asked: "Then it becomes a question that I ask to each of you: Do you want to reach a stipulation? Is there going to be an offering of documents?" The court also stated: "If the two of you can reach an agreement, that is great. If you cannot, then come back to me and I'll make the final determination to how it is presented to the jury." The trial court asked defendant, "Does this sound agreeable?" and defendant responded, "Yeah."

The trial court concluded this discussion by stating: "That also, again, [the prosecutor], I note that you have prior convictions that are also alleged on our amended number 3, in addition to the [Evidence Code section] 1108 prior that is alleged as a special allegation pursuant to [section] 667.61, but we also have the additional prior convictions with respect to, as you indicated, [section] 667(d) and (e) as well as [section] 667(a). [¶] My question would be, I want that clarified as well how that evidence will be presented to this jury for determination on the prior convictions, as [defendant] is certainly entitled to have a jury determine the truth of his prior convictions." Defendant did not make any objection or state he wished to bifurcate or waive a jury trial as to the prior conviction sentencing enhancement allegations.

At another pretrial hearing, the prosecutor stated, "As to the prior convictions, [defendant] and I did discuss, I think we're going to proceed by way of written stipulation. I'm going to draft something, show it to [defendant] tomorrow. If he's agreeable with the language as proposed, I believe that's the direction we're going to go. [¶] Is that correct, [defendant]?" Defendant responded, "Yes, yes."

During his opening statement, the prosecutor stated, without any objection from defendant:

"Members of the jury, part of the evidence [I] will show you toward the end is that the defendant is also alleged to have these prior convictions. You'll have evidence that in a previous hearing the defendant had testified under oath and admitted that he has a prior conviction for a violation of Penal Code section 289 subsection (a), also known as sexual penetration by force with a foreign object to another. That was back in 1999. And that in 2001 the defendant had been convicted of a felony violation of Penal Code section 211, also known as robbery.

"So, in addition to the evidence from the defendant's own testimony admitting those previous convictions, there are also certified court records and documents showing that the defendant was convicted of those charges. And as to the robbery,

29

there's an allegation here that he spent time in state prison. He was sentenced to 11 years in state prison and that within five years of serving that sentence, the new charges came about.

"So, in 2001 he was sentenced to 11 years of state prison for the robbery. By 2014, less than five years after all of that, are the present charges before you."

The prosecutor concluded his opening statement: "At the conclusion of this case, members of the jury, I'm not asking you to decide anything other than whether or not the defendant violated the law as charged, three counts with the prior allegations for his prior convictions. [if] I submit to you that at the close of all of this, you will find ... that he's guilty of these charges and that the prior allegations are true. Thank you."

During trial, outside the presence of the jury, the prosecutor stated "I did provide [defendant] redacted copies of the certified documents that I plan to use for proving up the priors, including his prior transcript testimony. [Defendant] has [had] an opportunity to review all of the redactions. They are essentially to eliminate the things that didn't have to do with the charged crimes that I'm proving up for the priors and as to his prior testimony, also redacting anything that had testimony not related to the prior felony convictions."

The trial court asked defendant whether he had had the opportunity to review the documents the prosecutor had placed on the record, and defendant answered "yes." Defendant did not object to the prosecutor offering evidence for the purpose of

30

proving up the prior conviction sentencing enhancement allegations for the jury's determination of their truth.[5]

After the parties rested, the jury was instructed, without objection by defendant, on deciding the truth of the prior conviction sentencing enhancement allegations.

After the jury returned its verdicts, defendant filed a request to be appointed counsel; the request was granted. Defendant's new counsel filed a motion for a new trial arguing the evidence was insufficient to support the conviction for kidnapping to commit a sex offense and circumstances affected defendant's ability to be sufficiently prepared to represent himself at trial.[6] The motion also requested that the trial court strike enhancements "as remote in time and both arising from the same set of operative facts" and due to Legislative changes to relevant statutes with respect to some of the enhancements. The motion for a new trial did not argue the trial court erred or the prosecutor engaged in misconduct on the ground that trial on the prior conviction sentencing enhancement allegations had not been bifurcated.

**B.**

*Applicable Legal Standards*

"[T]o preserve a claim of prosecutorial misconduct for appeal, ""a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety."' [Citation.] The lack of a timely objection and

---

[5] At oral argument, defendant's counsel argued that defendant had objected to the admission of the prior convictions evidence. Counsel is correct that defendant objected to that evidence, but on the grounds of its admissibility under Evidence Code section 1108 and for the purpose of impeachment. Defendant did not object to the admission of prior convictions evidence on the ground there should be a bifurcated trial on the prior conviction sentencing enhancement allegations pursuant to defendant's jury waiver and bifurcation agreement before his first trial.

[6] Defendant does not challenge the trial court's ruling on the motion for a new trial in this appeal.

31

request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' [Citation.] ""A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."""" *(People v. Hoyt* (2020) 8 Cal.5th 892, 942-943.)

## C.

### Defendant Forfeited His Contention of Prosecutorial Misconduct; Even *If Not Forfeited, His Contention Is Meritless or Would Constitute Harmless Error.*

Defendant remained silent when several opportunities arose to request the extension of enforcement of counsel's pre-first trial agreement to bifurcate the prior conviction sentencing enhancement allegations to the second trial. When it became clear that the prosecutor was intending to prove up those allegations at the trial of the underlying offenses, defendant remained silent and did not object. He did not object when, during the opening statement, the prosecutor told the jury it would be receiving evidence regarding and deciding the truth of those allegations. He did not include the lack of a bifurcated trial in his motion for new trial. Nothing in the record suggests that it would have been futile for defendant to raise a timely objection. To the contrary, a timely objection would have undoubtedly cured the harm defendant contends he suffered.

To the extent defendant has not forfeited this argument, the record does not show that proceeding with a unified trial was fundamentally unfair or that the prosecutor used deceptive or reprehensible methods to do so. Defendant has failed to show, in any event, how he was harmed as a result of a unified trial given that the jury was fully aware

32

of his prior convictions as evidence regarding them was admitted under Evidence Code section 1108 and/or to impeach his testimony.

In his opening brief, he argues: "Even if this Court were to conclude that admissions of [defendant]'s priors were admissible for the purpose of propensity evidence and/or for impeachment, it is significant that in the first trial, the jury did not find [defendant] guilty of the three charges resulting in conviction in the second trial, and in the first case, trial on the prior convictions had been bifurcated, which itself indicates prejudice." But the jury received evidence of both prior convictions at the first trial as well, albeit for impeachment purposes and not for the purpose of proving up the truth of the prior conviction sentencing enhancements themselves.

## VI.

### THE TRIAL COURT DID NOT ERR BY INSTRUCTING THE JURY AT BOTH OF DEFENDANT'S TRIALS WITH CALCRIM NO. 1190.

At both of defendant's trials, the trial court instructed the jury with CALCRIM No. 301 on the testimony of a single witness: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." The trial court also instructed both juries with CALCRIM No. 1190: "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone."

Defendant contends CALCRIM No. 1190 was given in error at both trials because it "impermissibly lightens the prosecution's burden of proof by bolstering a victim's testimony, the trial court prejudicially violated appellant's Fourteenth Amendment right to due process." Defendant did not raise any objection to CALCRIM No. 1190 being given to the jury at either trial. Even if the instructional error challenge is not forfeited, it is without merit.

Defendant argues CALCRIM No. 1190 is constitutionally defective because it does not include language requiring that the jury believe the testimony of the

33

complaining witness beyond a reasonable doubt before returning a conviction. He argues this deficiency, combined with CALCRIM No. 301, lowers the burden of proof for the prosecution. We review a claim of instructional error de novo. *(People v. Posey* (2004) 32 Cal.4th 193, 218.)

In *People v. Gammage* (1992) 2 Cal.4th 693, 701 *(Gammage),* our Supreme Court approved the use of instructions similar to those challenged here by defendant. In *Gammage,* the Supreme Court held the CALJIC instructions given there did not '"dilute[] the "beyond a reasonable doubt" standard."' *(Ibid)* The Supreme Court concluded in *Gammage,* "[a]lthough no corroboration is required in most prosecutions, ... trials of sex crimes, which often are a credibility contest between the accused and the accuser, have 'special features which make such an instruction on lack of corroboration most proper."' *(Id* at p. 702.)

Defendant acknowledges the Supreme Court's holding in *Gammage* and that the "use of CALJIC instructions similar to the CALCRIM instructions used in this case was affirmed by the California Supreme Court" in *Gammage.* Defendant contends *Gammage* was wrongly decided. We are bound by California Supreme Court authority. *(Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We therefore follow the holding of *Gammage* approving the use of similar jury instructions and rejecting the argument the instructions lower the prosecution's burden of proof.

Defendant also argues *Gammage* is nevertheless distinguishable from the instant case and "is not dispositive because [the] combination of CALJIC instructions considered by the *Gammage* Court was more protective of the presumption of innocence than the combination of CALCRIM instructions here." In support of this argument, defendant states "[m]issing from the CALCRIM instruction [No. 301] is the emphasis in CALJIC No. 10.21 instructing the jury, 'before finding any fact *required to be established by the prosecution* to be proved solely by the testimony of a single witness, you should carefully review all the testimony upon which the proof of such fact

34

depends."' Defendant's argument is based on a distinction without a difference. We do not agree that the italicized language contained in CALJIC No. 10.21 renders the Supreme Court's holding in *Gammage* inapplicable to the instant case.

In any event, there was no instructional error. "Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." *(People v. Holt* (1997) 15 Cal.4th 619, 677.) Here, the jury was unequivocally and repeatedly instructed the prosecution's case must be proved beyond a reasonable doubt before it could convict defendant. Those instructions included CALCRIM No. 220, which states, in part, "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." The jury was also instructed with CALCRIM No. 200 to "[p]ay careful attention to all of these instructions and consider them together."

Nothing in CALCRIM Nos. 301 and 1190 altered the prosecution's burden of proof and nothing supports the conclusion the jury applied CALCRIM No. 1190 in a way that violated the Constitution. "In addition, "'we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given."'" *(People v. Covarrubias* (2016) 1 Cal.5th 838, 915.) CALCRIM No. 1190 is not constitutionally defective.

## VII.

### OUR INDEPENDENT REVIEW OF SUBPOENAED MEDICAL RECORDS REVIEWED IN CAMERA BY THE TRIAL COURT REVEALS NO REVERSIBLE ERROR.

In December 2018, after the first jury trial and in anticipation of the second jury trial, the trial court received Amber's medical records that defendant had subpoenaed from her health care provider, Kaiser Permanente. Defendant moved for the release of the records to his defense investigator; the prosecutor and Amber objected to their release.

35

At the hearing to determine whether the medical records should be released, defendant explained he was seeking such records to discover evidence of Amber's history of mental illness and emotional instability for impeachment purposes. The trial court thereafter conducted an in camera review of the subpoenaed medical records, which consisted of 5275 pages, and found 41 of those pages to contain relevant information. After redacting irrelevant information on those 41 pages, the trial court produced the redacted pages to defendant. The trial court, finding the remaining records were not germane to defendant's defense, denied his request for access to them.

In his opening brief, defendant made an unopposed request for us to independently review the records that were not produced to him by the trial court. We ordered the trial court to transmit a copy of the documents the court received in response to the subpoena and a copy of the redacted documents the court released to defendant. The trial court complied with our request.

This court has reviewed all of the documents transmitted by the trial court. In addition to the 41 redacted pages released by the trial court referencing Amber's undisputed health issues involving seizures and hallucinations, we have identified an additional 18 pages out of the 5275 pages that either refer to Amber having experienced or having not experienced a seizure at a particular time. One of those 18 pages also refers to Amber suffering a hallucination four months after the charged offenses occurred.

We do not need to decide if the trial court erred because even if the trial court's failure to produce the additional 18 pages constituted error, we would conclude it was harmless error. The additional 18 pages contain information that is cumulative to the information that was produced to defendant. The reference to Amber suffering a hallucination four months after the charged offenses occurred is irrelevant.

It was undisputed at trial that Amber suffered from several medical and psychiatric conditions, including seizures. Defendant's expert neuropsychologist testified

36

that Amber's seizures and other health issues can affect her cognitive functioning and memory processes.

Given the content of the additional pages, we cannot conclude it was more likely than not that the trial court's failure to produce those pages might have caused a different result at the second trial. We therefore find no reversible error.

## DISPOSITION

The judgment is affirmed.

FYBEL, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.